IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:20-cv-00272-MR

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| **CHEMTRONICS, INC.** and | ) | |
| **NORTHROP GRUMMAN SYSTEMS** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the United States' Motion to Enter Consent Decree [Doc. 8].

**I.     PROCEDURAL BACKGROUND**

On September 29, 2020, the United States filed this civil action pursuant to the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") and Section 7003 of the Resource Conservation and Recovery Act ("RCRA") against Defendants Chemtronics, Inc. ("Chemtronics") and Northrop Grumman Systems Corp ("Northrop") (collectively "Defendants") regarding a Superfund Site in Swannanoa, Buncombe County, North Carolina (the "Site"). [Doc. 1].

In its First Claim for Relief, the United States seeks the recovery of response costs from the Defendants pursuant to 42 U.S.C. § 9607(a) ("CERCLA § 107(a)"). [Id. at 9-10]. In its Second Claim for Relief, the United States seeks a declaratory judgment that each of the Defendants is jointly and severally liable for future response costs incurred by the United States pursuant to 42 U.S.C. § 9613(g)(2) ("CERCLA § 113(g)(2)"). [Id. at 10]. In its Third Claim for Relief, the United States seeks a mandatory injunction requiring the Defendants, jointly and severally, to undertake certain remedial action identified in the Environmental Protection Agency's ("EPA") second amendment to its 1988 Record of Decision ("ROD Am. No. 2"), pursuant to 42 U.S.C. 9606(a) ("CERCLA § 106(a)"). [Id. at 10-11]. In its Fourth Claim for Relief, the United States seeks injunctive relief requiring the Defendants to abate the imminent and substantial endangerment to health or the environment arising from releases and threatened releases of solid and/or hazardous waste at the Site, pursuant to 42 U.S.C. § 6973(a) ("RCRA § 7003"). [Id. at 11 -12].

Contemporaneous with filing of the Complaint, the parties filed a proposed Consent Decree, which they represented would resolve the United States' claims in this matter. [Doc. 2]. The United States specifically requested that the Consent Decree not be entered prior to the expiration of

2

a 30-day public comment period. [Id.].[1] On March 30, 2021, with no further activity occurring in the case, the Court entered an order for the parties to show cause as to why the proposed Consent Decree should not be entered. [Doc. 7]. On April 12, 2021, the United States filed the present motion, seeking the entry of the Consent Decree. [Doc. 8].[2]

## II. SITE BACKGROUND

### A. Site Ownership, Operation, and Disposal History

The Site is currently owned by Defendant Chemtronics, and encompasses 541.9 acres. [Doc. 1 at ¶ 7]. It is part of a larger parcel owned by Defendant Chemtronics that consists of a total of 1065 acres. [Id.]. The Site was formerly the location of a manufacturing facility for the production of incapacitating agents, such as tear gas. [Id. at ¶ 14]. These activities generated hazardous wastes. [Id. at ¶ 13-20]. The Site was owned and operated by the predecessor-in-interest of Defendant Northrop, and

---

[1] The 30-day period for public comment on the proposed Consent Decree ended on November 4, 2020. [See Notices, 85 Fed. Reg. 62763 (October 5, 2020)].

[2] Thereafter, WASCO LLC filed a motion to intervene in this matter. [Doc. 11]. The Court has disposed of WASCO's motion by way of a separate Order entered contemporaneously herewith.

3

thereafter by Defendant Chemtronics.[3] [Id. at ¶¶ 8-12]. The manufacturing facility ceased operations in 1994. [Id. at ¶¶ 8, 11].

During their ownership, Defendants generated hazardous wastes. [Id. at ¶¶ 13-20]. These hazardous wastes included solvents, spent acid, and other chemical wastes. [Id.]. These hazardous wastes were disposed of at the Site in what is now referred to as the Acid Pit Area in the Back Valley, and a lagoon in the Front Valley.[4] [Id.].

### B. Enforcement History

On April 5, 1988, the EPA issued a directive (Record of Decision, hereinafter "ROD") ordering the remediation of 23 known waste disposal areas on the Site. [Id. at ¶¶ 22, 24]. This involved capping and fencing the six principal waste disposal areas in the Front and Back Valley with waste left in-place, and installing a groundwater pump-and-treat system, together with continued monitoring of groundwater and surface water. [Id.]. The next year EPA amended the ROD ("ROD Am. No. 1") to eliminate some

---

[3] Defendant Northrop's predecessor was Northrup Carolina, Inc., ("NCI"). [Id. at ¶ 10]. It operated the facility from 1965 to 1971. [Id.]. NCI leased the facility to Airtronics, a predecessor-in-interest of Defendant Chemtronics, beginning in 1971, and sold the Site to Defendant Chemtronics in 1978. [Id. at ¶ 11-12]. The facility was owned and operated from 1952 to 1965 by CNA Holdings, LLC ("CNA"), which is not a party to this proceeding. [Id. at ¶ 9].

[4] The Site is divided into two distinctly separate geographic areas by a prominent ridge, the two separate geographic areas are referred to as the "Front Valley" and the "Back Valley." [See Doc. 2-7 at 15, 76].

4

contaminated soil stabilization measures that the EPA no longer considered necessary. [Id. at ¶ 23]. The ROD, as amended in 1989, was completed in 1993. [Id. at ¶ 25].

In 1990, pursuant to RCRA, the EPA completed a Facility Assessment ("RFA") at the Site. [Id. at ¶ 26]. The RFA included the areas that were not being addressed under CERCLA pursuant to the ROD as amended (ROD Am. No. 1). [Id.]. The RFA identified 123 areas on the Site to be further evaluated by the State of North Carolina Department of Environment and Natural Resources ("NCDENR").[5] [Id.]. In August 1997, Chemtronics entered into an Administrative Order on Consent ("AOC") with the NCDENR for further remediation. [Id. at ¶ 27]. Subsequent RCRA actions at the Site under the NCDENR's supervision consisted of soil, groundwater and surface water sampling, soil excavation, and the cleaning and closing of wastewater sumps. [Id.].

On March 9, 2007, EPA assumed full oversight authority for the Site under its Superfund Program. [Id. at ¶ 28]. On October 27, 2008, Defendants entered into a Site-wide AOC[6] with the EPA for Defendants to conduct a Remedial Investigation and Feasibility Study ("RI/FS") for the Site. [Id. at ¶

---

[5] Now the North Carolina Department of Environmental Quality ("NCDEQ"). [Id.].

[6] CNA was also a party to this AOC. [Id.].

29]. As a result thereof, on September 29, 2016, the EPA issued a second amendment to the ROD ("ROD Am. No. 2") ordering the following remedial action at the Site:

> (1) Excavation of contaminated soil for certain contaminated areas; (2) Enhanced In-Situ Bioremediation with long-term groundwater monitored natural attenuation for contaminated groundwater for certain contaminated areas; (3) Placement of Institutional Controls at the Site to, at a minimum, (i) limit the use of the Site to either commercial or industrial purposes, and (ii) restrict groundwater use and prevent the use of on-Site groundwater for potable purposes; (4) Maintenance of the caps and engineering controls for six existing disposal areas as required by the original EPA Record of Decision relating to the Site; (5) Implementation of performance monitoring and evaluation; (6) Elimination of the requirement for pumping and treating groundwater as specified in the … ROD; and (7) Periodic evaluation of the selected remedy.

[Id. at ¶ 33].

### C. Present Proceeding and Consent Decree

The parties now move for the Court to enter the proposed Consent Decree. Under the Consent Decree, the settling Defendants will: (1) perform the remedial actions set forth in the ROD Am. No. 2; (2) pay the EPA for its unreimbursed past response costs, totaling $255,348.51; and (3) pay the

6

Case 1:20-cv-00272-MR    Document 19    Filed 04/14/22    Page 6 of 17

EPA for any future response costs in connection with the Site.[7] [Docs. 2-1 at ¶¶ 4, 6, 34-35; 8]. The Defendants will also provide financial assurance for the benefit of the EPA and pay any associated penalties for failure to perform the remedial actions. [Id. at ¶¶ 26 -64].

Under the Consent Decree, the United States in turn covenants not to sue or take administrative action against the settling Defendants relating to the Site, subject to certain reservations, such as for unknown conditions or new information indicating further remedial action is needed. [Id. at ¶¶ 65-69, 78]. Further, if the Defendants fail to perform the remedial actions, the United States reserves the ability to take over and complete the remedial work at the Site. [Id. at ¶ 70].

## II. STANDARD OF REVIEW

A consent decree is a negotiated agreement that "'has elements of both judgment and contract,' and is subject to 'judicial approval and oversight' generally not present in other private settlements." Szaller v. Am. Nat. Red Cross, 293 F.3d 148, 152 (4th Cir. 2002) (quoting Smyth v. Rivero, 282 F.3d 268, 279–80 (4th Cir. 2002)). "Because it is entered as an order of

---

[7] The Site – per the Consent Decree – includes not only the Superfund Site, but also any hazardous waste emanating from it. [Doc. 2-1 at 3].

the court, the terms of a consent decree must also be examined by the court." Smyth, 282 F.3d at 280.

The Fourth Circuit has explained that, when considering whether to enter a proposed consent decree, courts "should be guided by the general principle that settlements are encouraged." United States v. North Carolina, 180 F.3d 574, 581 (4th Cir. 1999). Further, "[t]he presumption in favor of settlement is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency specially equipped, trained, or oriented in the field." United States v. Cannons Eng'g Corp., 720 F. Supp. 1027, 1035 (D. Mass. 1989), aff'd, 899 F.2d 79 (1st Cir. 1990) (internal citation omitted); see also United States v. Akzo Coatings of Am., Inc., 949 F.2d 1409, 1436 (6th Cir. 1991). Nevertheless, "before entering a consent decree the court must satisfy itself that the agreement is 'fair, adequate, and reasonable' and 'is not illegal, a product of collusion, or against the public interest.'" North Carolina, 180 F.3d at 581 (quoting United States v. Colorado, 937 F.2d 505, 509 (10th Cir. 1991)).

"Fairness has both procedural and substantive components." United States v. Duke Energy Carolinas, LLC, 499 F. Supp. 3d 213, 218 (M.D.N.C. 2020) (citing Cannons Eng'g Corp., 899 F.2d at 86–88). Procedural fairness

8

is measured by gauging the "candor, openness, and bargaining balance" of the negotiation process, whereas substantive fairness requires that a party "bear the cost of the harm for which it is legally responsible." Id. Substantive fairness is closely linked to reasonableness and adequacy, which are not mutually exclusive and cannot be reviewed in isolation. See Duke Energy Carolinas, LLC, 499 F. Supp. 3d at 218 (collecting cases). "Ultimately, the court's core concern in deciding whether to approve a proposed [consent] decree is with ensuring that the decree furthers the public interest as expressed in CERCLA." Duke Energy Carolinas, LLC, 499 F. Supp. 3d at 218 (quoting United States v. Rohm & Haas Co., 721 F. Supp. 666, 680 (D.N.J. 1989)). The public interest, as expressed in CERCLA, is served by "facilitating efficient responses to environmental harm, holding responsible parties liable for the costs of the cleanup, and encouraging settlements that reduce the inefficient expenditure of public funds on lengthy litigation." United States v. E.I. du Pont de Nemours & Co., No. 5:16-CV-00082, 2017 WL 3220449, at *11 (W.D. Va. July 28, 2017) (internal citations omitted). Accordingly, "[c]ourts considering CERCLA cases have recognized that the usual federal policy favoring settlements is even stronger in the CERCLA context." Duke Energy Carolinas, LLC, 499 F. Supp. 3d at 217 (quoting B.F. Goodrich v. Betkoski, 99 F.3d 505, 527 (2d Cir. 1996)).

## III. DISCUSSION

The parties contend that the Consent Decree is fair, adequate, reasonable, and consistent with the public interest. [Docs. 8, 8-1]. Therefore, the parties contend that the Consent Decree meets the Fourth Circuit's standard for approval, and that the Court should approve the settlement. [Doc. 8-1].

### A. Fairness, Adequacy, and Reasonableness

Here, the parties engaged in extensive negotiations over the terms of the settlement, including the work to be performed and the scope of the covenants. [See Docs. 2-1, 8-1 at 10]. All parties were represented by knowledgeable and experienced counsel and had the assistance of professionals with necessary expertise. [Id.] The Consent Decree reflects the parties' careful and informed assessment of the Site, the parties' past and future environmental response actions, and the effects of the settlement. [Id.]. The negotiations were conducted with the knowledge and valid consent of all parties. [Id.]. As such, the Consent Decree is the result of good-faith, arms-length bargaining between the parties. [Id.]. Further, the administrative actions and negotiations have spanned decades, with the Defendants entering into the consent order resulting in the Remedial Investigation and

Feasibility Study with the EPA, which resulted in the EPA's 2016 order (ROD Am. No. 2), and ultimately culminating in the present Consent Decree.

While this matter has not proceeded to discovery, the entirety of the history and background concerning the Site, as well as the parties' intimate knowledge of the extensive studies conducted and past response actions beginning in 1988, reflects that the Consent Decree is the culmination of significant expenditure of time and actions by well-informed parties. In addition, the public was given the opportunity to comment and submit matters of concern regarding the EPA's ROD Am. 2, which is the foundation upon which the entire settlement rests. [See Docs. 2-11, 8-3]. Further, following the filing of the proposed Consent Decree, the public was again given the opportunity to comment, and only one comment[8] was submitted. There is no suggestion that the parties failed to act in good faith in negotiating the terms of the Consent Decree. [Doc. 8-1]. As such, the Consent Decree is procedurally fair.

---

[8] WASCO submitted voluminous documents in support of its public comment regarding the Consent Decree. [See Docs. 9, 9-1, 9-2, 9-3, 9-4, 9-5, 9-6, 9-7, 10, 10-1, 10-2, 10-3, 10-4]. WASCO's public comment concerns an approximately one-acre parcel of land, known as the Northrop Dump – DA/24, that is not encompassed within the Site at issue in the present Consent Decree. [Id.]. Further, WASCO has initiated a lawsuit pursuant to CERCLA seeking, *inter alia*, remediation costs for the Northrop Dump – DA/24 against the Defendants. [See Case No. 1:20-cv-227].

11

With regard to substantive fairness, Chemtronics and Northrop are responsible parties liable for the cleanup of the Site and, under the Consent Decree, will be bearing the full burden of implementing the remediation of the Site and fully paying EPA's unreimbursed response costs. [See Docs. 1, 2-1]. Significantly, the Defendants will also be obligated to pay future response costs. [Doc. 2-1 at ¶¶ 15-19]. The Defendants do not contest resolving the case by way of the Consent Decree and incurring the obligations contained therein. [Id. at 46, 47]. Further, the remediation of the Site has been incremental and partial, and the Consent Decree provides a means to commit the parties to a comprehensive and final remediation. By entering the Consent Decree, the cleanup of the Site can begin in earnest and presents the best option for the United States to fulfill the purposes of CERCLA and for the Defendants to avoid further litigation as to the Site. Accordingly, the Consent Decree is substantively fair.

The Consent Decree is also reasonable and adequate. Based on the result of the process leading up to the EPA's 2016 order (ROD Am. No. 2), once work undertaken pursuant to the Consent Decree is completed, the parties anticipate that no further cleanup will remain to be done at the Site. [Docs. 2-1, 2-7, 8-1]. Under the Consent Decree, the Defendants agree to perform the full remedy set forth in ROD Am. No. 2 and to reimburse the EPA

for past and future costs. [Id.]. Further, the Consent Decree accounts for the inherent uncertainty involved in remediation of a hazardous waste site, such as unexpected issues, challenges, and costs arising during the remediation of the Site. [See Doc. 2-1 at ¶¶ 34-71]. It is a concern in CERCLA cases that, "the extent of harm cannot be completely and accurately identified." United States v. ConocoPhillips Co., No. 2:10CV1556, 2011 WL 1113703, at *3 (W.D. La. Mar. 24, 2011). The inherent uncertainty of harm is addressed in the present case, as the United States not only seeks reimbursement of past costs, but also has secured the remediation of any future ecological harm at the Site so as to eliminate any imminent and substantial endangerment to the public health and welfare. [Docs. 1, 2-1].

Additionally, entry of the Consent Decree will resolve this matter before the parties incur substantial costs engaging in discovery and motions practice, and the settlement reflected in the Consent Decree properly accounts for the uncertainties inherent in litigation. Further, the Consent Decree ensures the cleanup of the Site by requiring the Defendants to secure financial assurance for the benefit of the EPA in the event it takes over the remedial work. [Doc. 2-1 at ¶¶ 26-33]. Accordingly, the Consent Decree is fair, reasonable, and adequate to address the Site.

## B. The Public Interest and CERCLA Objectives

By securing the Defendants' agreement to perform the remedial action at the Site and to pay the EPA's unreimbursed response costs, the Consent Decree advances the two major policy concerns underlying CERCLA: (1) "that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal," and (2) "that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created." Cannons II, 899 F.2d at 90-91; see also Akzo Coatings, 949 F.2d at 1439. By resolving this action without protracted litigation, the Consent Decree serves to "reduce excessive litigation expenses and transaction costs, thereby preserving scarce resources for CERCLA's real goal: the expeditious cleanup of hazardous waste sites." United States v. DiBiase, 45 F.3d 541, 546 (1st Cir. 1995); B.F. Goodrich v. Betkoski, 99 F.3d 505, 527 (2d Cir. 1996) ("Courts . . . have recognized that the usual federal policy favoring settlements is even stronger in the CERCLA context."). Entry of the Consent Decree is also in the public interest because it represents a voluntary settlement that resolves the United States' claims without further delaying the cleanup of the Site due to lengthy litigation. See, e.g., Behrens v.

Wometco Enterprises, Inc., 118 F.R.D. 534, 538, (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990). Further, the parties have already devoted considerable time to addressing the Site and ultimately bringing about the settlement as set forth in the Consent Decree. [See Docs. 2-1, 2-2, 2-3, 2-4, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9, 2-10, 2-11, 2-12, 2-13, 2-14, 2-15, 8-1, 8-2, 8-3, 8-4, 8-5]. Rejecting the Consent Decree would result in the parties engaging in complex litigation and consume a considerable amount of Government resources – administrative, executive, and judicial – all while no remedial action is taken to address the Site.[9] Further litigation in this matter will not serve the public interest or conserve the resources of the Government, but instead serve to only delay implementation of the work set forth in ROD Am. No. 2, thus allowing the hazardous substances at the Site to remain unaddressed.

As noted earlier, there has only been one documented public comment to the proposed Consent Decree, which was lodged by non-party WASCO. [See Docs. 9, 9-1, 9-2, 9-3, 9-4, 9-5, 9-6, 9-7; 10, 10-1, 10-2, 10-3, 10-4]. WASCO's opposition to the Consent Decree, however, is not with regard to the matters addressed in the Consent Decree. Rather, WASCO's concern is

---

[9] Indeed, if the parties were to further litigate this matter, it is far from clear that a substantially more positive result would occur for the parties or the public, as compared to the proposed Consent Decree.

that this Consent Decree could adversely affect its claims in separate litigation against these Defendants regarding other property, if this Consent Decree were to encompass that other property. WASCO has also filed a motion to intervene in the present matter primarily on that same basis, as also contained in its public comments. The Court addresses WASCO's motion to intervene in a separate order entered contemporaneously herewith. WASCO's concern, however, pertains only to its litigation interest and not the public interest at-large. Even considering this very limited comment in opposition to the proposed Consent Decree, the entry of the Consent Decree remains in the best interest of the public.

Finally, entry of the Consent Decree will result in the Defendants bearing all of the costs of the remediation, including paying the EPA's past costs incurred in connection with the Site and will allow the implementation of the remediation actions selected in ROD Am. No. 2 to remedy the ecological harms sustained at the Site and eliminate the endangerment of the public from such ecological harms. Accordingly, the terms of the Consent Decree are consistent with the objectives of CERCLA and in the public interest.

## IV. CONCLUSION

For the reasons stated, the Court finds the proposed Consent Decree is fair, reasonable, and adequate, as well as consistent with the objectives of CERCLA and in the public interest.

**IT IS, THEREFORE, ORDERED** that United States' Motion to Enter Consent Decree [Doc. 8] is **GRANTED**, and the proposed Consent Decree [Doc. 2-1] is hereby **ENTERED** contemporaneously herewith.

**IT IS SO ORDERED**.

Signed: April 14, 2022

Martin Reidinger
Chief United States District Judge